1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CAMERON BROWN,                          No. C 08-05529 CW (PR)

        Petitioner,

      v.                               ORDER DENYING PETITION FOR WRIT
                                        OF HABEAS CORPUS; DENYING IN
LARRY SMALL, Warden,                    PART AND GRANTING IN PART
                                        CERTIFICATE OF APPEALABILITY
        Respondent.

_____/

INTRODUCTION

    Petitioner Cameron Brown, a prisoner of the State of California
who is incarcerated at CSP-Calipatria, seeks a writ of habeas corpus
pursuant to 28 U.S.C. § 2254.  Petitioner filed his Petition on
December 9, 2008 and his Amended Petition on June 15, 2009.  On June
23, 2009, the Court issued an Order to Show Cause why the writ
should not be granted and on November 19, 2009, Respondent filed an
Answer.  Petitioner did not file a Traverse.

    For the following reasons, and having considered all of the
papers filed by the parties, the Court DENIES the Amended Petition.

PROCEDURAL HISTORY

On October 5, 2005, a jury in Monterey County Superior Court found Petitioner guilty of first degree murder (Cal. Penal Code § 187(a)) and that he personally discharged a firearm causing great bodily injury.  (Cal. Penal Code § 12022.53(d)).  The trial court sentenced Petitioner to fifty years to life.

Petitioner appealed and on September 18, 2007, the California Court of Appeal affirmed the judgment in an unpublished order and denied Petitioner a writ of habeas corpus.  People v. Brown, No. H029702, Court of Appeal of the State of California, Sixth Appellate District, September 18, 2007 (filed by Respondent as Ex. 7 and hereinafter "Opinion").  The California Supreme Court denied review of Petitioner's direct and collateral appeals.

STATEMENT OF FACTS

The California Court of Appeal summarized the factual background of this case as follows:

> On March 20, 2004, Kym Lee Roman drove her Monte Carlo automobile to a hair salon.  Her son, Deshaum Lee, drove to the salon in Roman's rented Cadillac and exchanged car keys with her.  Lee drove the Monte Carlo to a Kragen's auto store in Seaside and parked near a Mustang.  He went inside where he conversed with James Washington, the owner of the Mustang.  At approximately 11:00 a.m., defendant exited from the passenger's side of the Monte Carlo.  He wore a hooded sweatshirt that covered his head.  He looked around.  He walked toward the Mustang and pulled out a gun.  Albert Johnson got out of the Mustang and grabbed defendant's gun hand, but defendant shot Johnson five times.  Defendant ran behind Kragen's.  Kragen's customer Dennis Rockwell heard the shots while he was parking.  He then saw defendant push a gun into his sleeve and run away behind Kragen's.  He pursued in his truck to where he believed that he could intercept defendant.  He eventually pulled even with defendant who was then walking and without a sweatshirt.  Defendant

2

looked at Rockwell and ran away when he saw Rockwell use a cell phone to call 911.  Three days later, Rockwell identified defendant from a police photo lineup.

At Kragen's, after the shots, witnesses called 911. Lee then left the store for his car.  He drove away as the police arrived, and a high-speed chase ensued. Eventually, Lee lost control of the car and the police arrested him.  Officers found defendant's cell phone in the passenger seat.  They found elsewhere in the car Lee's cell phone, $825, and marijuana.  Roman arrived at the scene with three other women.  Officer Evelyn Espinoza asked Roman whether she knew who had been with Lee.  Roman was initially uncertain but ultimately said "Cameron." The police found defendant's and Lee's fingerprints in the Cadillac – defendant's prints were on the passenger-side seatbelt, dash, and door handle.  Sacramento authorities searched for defendant at the homes of relatives in Sacramento.  They finally found and arrested defendant in Sacramento on January 19, 2005.

The issue at trial was identity.

At trial, Rockwell could not identify defendant with certainty but reaffirmed his photo identification.  He explained that he did not see defendant's face in the Kragen's parking lot because of the sweatshirt hood but, after he set out in pursuit of the shooter, he saw someone running, then walking, who matched the physical description of and wore similar blue jeans as the murderer.  He added that he then saw defendant's face from 15 feet away.

Defendant presented alibi witnesses.

Defendant's mother, Melissa De La Cruz, testified that defendant was living with her sister, Billie Jo Jackson, in Sacramento during March 2004, and that she called Jackson at 8:23 a.m. on March 20, 2004, and talked to defendant.  Jackson testified that on March 19, 2004, she drove defendant and her boyfriend to Salinas for a funeral and the three returned at 8:00 or 9:00 p.m.; she added that she gave the phone to defendant the next morning when defendant's mother called and that defendant ultimately got out of bed at 10:30 a.m.  Defendant's friend Quincy McAllister, testified that he borrowed defendant's cell phone at the funeral, forgot to return it, used it to call family and friends, and gave it to Lee because Lee said that he was going to see defendant in Sacramento the next day. FN1.  Defendant's grandmother, Genevieve De La Cruz, testified that she saw defendant around noon in Sacramento on March 20, 2004, when he

3

1    babysat Jackson's daughter for her.  FN2.

2    FN1.  Cruz has two felony convictions; Jackson has two
     felony convictions; McAllister has one felony conviction.
3
     FN2.  Jackson's daughter lived with defendant's
4    grandmother.

5    Opinion at 2-3 (footnotes in original).

6                         LEGAL STANDARD

7         The Antiterrorism and Effective Death Penalty Act of 1996

8    ("AEDPA"), codified under 28 U.S.C. § 2254, provides "the exclusive

9    vehicle for a habeas petition by a state prisoner in custody

10   pursuant to a state court judgment, even when the petitioner is not

11   challenging his underlying state court conviction." White v.

12   Lambert, 370 F.3d 1002, 1009-10 (9th Cir. 2004).  Under AEDPA, this

13   court may entertain a petition for habeas relief on behalf of a

14   California state inmate "only on the ground that he is in custody in

15   violation of the Constitution or laws or treaties of the United

16   States."  28 U.S.C. § 2254(a).

17        The writ may not be granted unless the state court's

18   adjudication of any claim on the merits:  "(1) resulted in a

19   decision that was contrary to, or involved an unreasonable

20   application of, clearly established Federal law, as determined by

21   the Supreme Court of the United States; or (2) resulted in a

22   decision that was based on an unreasonable determination of the

23   facts in light of the evidence presented in the State court

24   proceeding."  28 U.S.C. § 2254(d).  Under this deferential standard,

25   federal habeas relief will not be granted "simply because [this]

26   [C]ourt concludes in its independent judgment that the relevant

27

28                                  4

state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. 362, 411 (2000).

While circuit law may provide persuasive authority in determining whether the state court made an unreasonable application of Supreme Court precedent, the only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) rests in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Williams, 529 U.S. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).

The state court decision to which 28 U.S.C. § 2254 applies is the "last reasoned decision" of the state court. See Ylst v. Nunnemaker, 501 U.S. 797, 803-804 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-1092 (9th Cir. 2005).  Although Ylst primarily involved the issue of procedural default, the "look through" rule announced there has been extended beyond that particular context. Barker, 423 F.3d at 1092 n.3 (citing Lambert v. Blodgett, 393 F.3d 943, 970 n.17 (9th Cir. 2004) and Bailey v. Rae, 339 F.3d 1107, 1112-1113 (9th Cir. 2003)).

Even if a petitioner meets the requirements of § 2254(d), habeas relief is warranted only if the constitutional error at issue had a substantial and injurious effect or influence in determining the jury's verdict. Brecht v. Abrahamson, 507 U.S. 619, 638 (1993). Under this standard, petitioners "may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in

'actual prejudice.'"   <u>Brecht</u>, 507 U.S. at 637, citing <u>United States</u>

<u>v. Lane</u>, 474 U.S. 438, 439 (1986).

DISCUSSION

Petitioner raises six claims in his Amended Petition.  All

claims are discussed below.

I.   Lee's Refusal To Testify

Petitioner makes several related sub-claims in conjunction with

Lee's refusal to testify at his trial.  He maintains that the

prosecutor committed misconduct and violated Petitioner's

confrontation right because he knew Lee would refuse to testify, yet

he referred to Lee's expected testimony in his opening statement.

In addition, Petitioner maintains that the trial court erred in

allowing the prosecutor to question Lee in front of the jury.  The

state court considered these issues in a lengthy, reasoned opinion

on direct appeal.

<u>REFUSAL TO TESTIFY</u>

For his part in the Kragen's incident, Lee pleaded
guilty to evading the police and possession of a firearm.
The People listed him as a potential witness against
defendant because he had told police that defendant was
his passenger at Kragen's.  During in limine proceedings,
the People sought a ruling to compel Lee's testimony
because Lee was refusing to testify on the ground of self-
incrimination.  They took the position that double
jeopardy barred further prosecution for the Kragen's
incident but never granted Lee use immunity in writing.
Lee demanded transactional immunity.  The trial court
opined that either double jeopardy or use immunity negated
the privilege.  But it deferred ruling on Lee's privilege
claim until the People required his testimony.  It
explained that it could hear the matter outside the jury's
presence and, if it upheld the privilege, Lee could invoke
it without having to do so in the jury's presence, but if
it denied the privilege, the People could call Lee as a
witness.  Defendant then objected to the People's stated
intention to mention Lee's police declaration and

6

possession of a gun and $825 in their opening statement.
He claimed that mentioning those items would be highly
prejudicial in the event that Lee did not testify.  The
trial court told the People that "If you mention it and
you can't prove up what you said, you've got yourself a
big problem," and told defendant that, if such a statement
was unproven and prejudicial, "the D.A. suffers a
mistrial."

In opening statement, the People stated that Lee possessed
a revolver and had in his car $850 and marijuana.  They
then opined that Lee had fled the Kragen's scene because
he neither wanted the police to find those items nor
desired "to be a witness to his friend's murder."  They
then outlined the following: "Lee was arrested there, and
he was taken to the station, he was interviewed, I think
three separate interviews.  The first interview he said,
'No one was with me.  I don't know what you are talking
about.'  The second interview he says, 'Well, someone was
with me, but it wasn't Cameron Brown.  I don't remember
the guy's name.'  And he went back and forth, then finally
admitted yes, I did – by the way, during the police chase
he threw his gun out the window, the .357 that was
recovered, he admitted throwing the .357 from the window,
admitted running from the scene because he didn't want to
be caught with the gun; he didn't want to be part of it.
Finally – " At this point, the trial court called a
sidebar conference after which the People concluded this
part of their opening statement by representing that Lee
would "be brought in here to tell you what he knows about
this incident."  When the People called Lee to testify,
the trial court ordered the jury outside the courtroom.
Lee' counsel then asserted that Lee was refusing to
testify.  The trial court ruled that Lee had no privilege
and was expected to testify.  It added that, if Lee
refused to testify, Lee's out-of-court statements to the
police were inadmissible (admission would compromise
defendant's right of confrontation) and Lee's failure to
testify could not be used in closing argument to suggest
that Lee's answers would have implicated defendant.  The
trial court then recalled the jury.  The People called Lee
as a witness and asked for his name.  Lee refused to
answer.  The People again asked Lee for his name.  Lee
refused to answer or explain.  The People then asked Lee
whether, on March 20, 2004, he drove his mother's rented
Cadillac, he drove his mother's Monte Carlo to Kragen's,
defendant was his passenger when he drove to Kragen's, and
whether he talked FN3. to Washington inside Kragen's.  Lee
refused to answer each question.  Defendant then objected
to further questioning, but the trial court overruled the
objection explaining that Lee had no privilege and it
would control the number and extent of the questions.  The

People then asked Lee who was Johnson, and who had been wearing a black jersey in court.  FN3.  Lee refused to answer each question.  The trial court then announced: "And at this point, I don't think any further questioning would be appropriate.  The witness has willfully disobeyed an order of the Court in the Court's presence, and I do find him in contempt of Court; it's a direct contempt. [¶] And for the benefit of the jury, in a case like this, I must remind you of some earlier instructions that I had given to you: A question is not evidence.  It may be considered only as it helps you to understand any answer given to the question.  Statements made by the attorneys during trial are not evidence.  You are not assume to be true any insinuations suggested by a question asked a witness.  It is up to you to draw your own conclusions as to any reasons a witness might have for refusing to testify, but you should not regard the questioning of this witness as having any evidentiary value."  In argument, the People addressed the identification issue by pointing out that (1) Rockwell positively identified defendant from the photo lineup, (2) witnesses gave similar descriptions of the murderer that comported with defendant's description, (3) the police found defendant's cell phone in the Monte Carlo's passenger seat, (4) Roman said that defendant was with Lee at the time in question, (5) the fingerprints in the recently rented Cadillac supported Roman's statement, and (6) defendant became a fugitive for 10 months.  They then continued: "Finally, he's a friend of . . . Lee's. You know, it's not a random person that we've got here.  We know that the person who did the killing rode to Kragen's in the passenger seat of . . . Lee's car.  We know that. [Defendant] is not a stranger to . . . Lee; he's his buddy.  He's his buddy, and he's the guy who's going to be sitting in that passenger seat, going to be the guy that did the killing. [¶] Ladies and gentlemen, . . . Lee knows exactly who did it. . . . Lee won't testify.  The Judge indicated to you he was told he had no Fifth Amendment rights, doesn't have any reason or opportunity to say, you know, I don't want to testify or I'm going to get myself in trouble; he was granted all – all he needed to do is testify, and he could testify without any danger to himself, and he still wouldn't testify.  It's up to you to decide why he wouldn't testify."

Under the rubric of Lee's refusal to testify, defendant makes a two-pronged claim of error.  He urges that (1) the People engaged in misconduct during opening statement by referring to Lee's expected testimony about Lee's police statement, while knowing that they were unlikely to produce the testimony, and (2) the trial court erred by permitting the People to question Lee in front of

the jury.  There is no merit to these claims.

A prosecutor may unquestionably refer to evidence in opening statement that he or she believes will be produced.  (People v. Barajas (1983) 145 Cal. App. 3d 804, 809.)  "[R]emarks made in an opening statement cannot be charged as misconduct unless the evidence referred to by the prosecutor 'was "so patently inadmissible as to charge the prosecutor with knowledge that it could never be admitted."'" (People v. Wrest (1992) 3 Cal. 4th 1088, 1108.)

Here, the People told the jury in opening statement that Lee first told the police that no one was with him, second told the police that someone was with him, and third admitted to the police that he threw a gun out of the car window.  Before the People made these remarks, the trial court had preliminarily opined that Lee had no privilege to refuse to testify.  During the discussion leading up to that preliminary opinion, Lee had not suggested that he would refuse to testify even if the trial court ultimately found the privilege inapplicable and ordered him to testify.  The most that can be said is that defendant unsuccessfully asked the trial court to limit the People's opening statement because of the possibility that Lee might not testify.  Under the circumstances and in context, defendant simply fails to carry his burden to show that the People knew that Lee's testimony would never be admitted.  Defendant's argument that the facts show "every indication [that] Lee was going to refuse to testify" fall short of this threshold.  There is therefore no need to address defendant's argument under People v. Barajas, supra, 145 Cal. App. 3d 804, that prejudice resulted from opening statement misconduct.

According to the United States Supreme Court, compelling a witness to assert a Fifth Amendment privilege before the jury can produce two possible grounds of reversible error: "First, some courts have indicated that error may be based upon a concept of prosecutorial misconduct, when the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege. . . . A second theory seems to rest upon the conclusion that, in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." (Namet v. United States (1963) 373 U.S. 179, 186-187.)  Under either theory, the vice is that the jury is steered toward drawing speculative inferences as to the substance of what the nontestifying witness would have said.  In the

words of the California Supreme Court, allowing a witness
to claim the privilege in front of the jury presents "to
the jury a speculative, factually unfounded inference."
(People v. Mincey (1992) 2 Cal. 4th 408, 442.)

Use immunity protects a witness against the use of a
witness's compelled testimony and "'use of evidence
derived therefrom.'" (People v. Kennedy (2005) 36 Cal. 4th
595, 613.)  A witness who has been granted immunity no
longer possesses a Fifth Amendment right: "We hold that
such immunity from use and derivative use is coextensive
with the scope of the privilege against self-
incrimination, and therefore is sufficient to compel
testimony over a claim of the privilege."  (Kastigar v.
United States (1972) 406 U.S. 441, 453.)

Thus, once Lee was granted immunity, his testimony
was compelled and he no longer had a privilege against
self-incrimination.  (United States v. Washington (1977)
431 U.S. 181, 187; see Kastigar v. United States, supra,
406 U.S. at p. 453; see also Pen. Code, § 1324.)  Evidence
Code section 913, which prohibits comment upon the
exercise of a privilege and prohibits the drawing of
adverse inferences from that exercise, was therefore
inapplicable.  The jury was entitled to draw a negative
inference when Lee refused to testify.  (People v. Lopez
(1999) 71 Cal. App. 4th 1550, 1554 (Lopez).)

In Lopez, a witness indicated out of the presence of
the jury that he would refuse to testify.  The witness did
not have a valid privilege against self-incrimination
because he had already entered a plea to the offense and
because the time for an appeal had passed.  When called to
the stand, the witness invoked the privilege and refused
to answer questions in front of the jury.  On appeal from
a conviction, the court held that the procedure followed
was proper.  It decided that when a trial court has
determined out of the presence of the jury that a
witness's privilege has been waived or no longer exists,
the jury is entitled to hear the witness's improper claim
of privilege and may draw a negative inference when the
witness refuses to answer questions.  (Lopez, supra, 71
Cal. App. 4th at pp. 1554-1555.)  The court specifically
explained: "Once a court determines a witness has a valid
Fifth Amendment right not to testify, it is, of course,
improper to require him to invoke the privilege in front
of a jury; such a procedure encourages inappropriate
speculation on the part of jurors about the reasons for
the invocation.  An adverse inference, damaging to the
defense, may be drawn by jurors despite the possibility
the assertion of privilege may be based upon reasons
unrelated to guilt.  These points are well established by

10

existing case law.  (See, e.g., <u>People v. Mincey</u>, <u>supra</u>, 2
Cal. 4th at p. 441.)  But where a witness has no
constitutional or statutory right to refuse to testify, a
different analysis applies.  Jurors are entitled to draw a
negative inference when such a witness refuses to provide
relevant testimony."  (<u>Id.</u> at p. 1554, italics omitted.)

Here, the trial court determined, out of the presence
of the jury, that Lee wished to exercise his Fifth
Amendment privilege.  Lee was granted use immunity but
indicated that he would still refuse to testify.  Thus,
the trial court properly permitted Lee to take the stand,
since it had determined, out of the jury's presence, that
he no longer had a privilege to claim.  (Accord, <u>United
States v. Romero</u> (2nd Cir. 1957) 249 F.2d 371, 375.)  The
People were then entitled to briefly question Lee to see
if he would change his mind about testifying once he was
actually in front of the jury.  As in <u>Lopez</u>, because Lee
no longer had a privilege to claim, there was no error in
the fact that the jury heard Lee refuse to answer the
questions put to him.

Defendant argues that <u>Lopez</u> was wrongly decided
because the case "failed to analyze the prejudicial effect
the procedure had on [him]."  But he cites no authority
for this proposition.

The cases that defendant cites do not require us to
reverse the judgment on the basis that defendant was
denied confrontation.  The cases finding a violation of
confrontation do so on the basis that the questions posed
to the mute witness adverted to prior statements made by
that witness, statement as to which cross examination was
not possible.  (See, e.g., <u>Douglas v. Alabama</u> (1965) 380
U.S. 415, 419-420; <u>People v. Rios</u> (1985) 163 Cal. App. 3d
852, 864 [additional citations omitted.]) For example, in
<u>Douglas v. Alabama</u>, where a witness refused to testify,
the United States Supreme Court observed that the right of
confrontation was denied because the defendant was unable
to cross-examine the witness as to his prior statement and
because the questions posed to the witness permitted the
jury to infer that the statement had been made and that it
was true.  (<u>Douglas v. Alabama</u>, <u>supra</u>, 380 U.S. at pp.
419-420.)

Here, the questions asked of Lee did not suggest that
he had previously given any statements, and no prior
statements of Lee were admitted which could not be cross-
examined.  Additionally, the trial court instructed the
jury to regard the People's questioning as having no
evidentiary value.  We must presume that the jury followed
that admonition and drew no inferences from the content of

11

1
2
3
4
5
6
7
8
9

the prosecutor's questions.  (People v. Adcox (1988) 47
Cal. 3d 207, 253.)  Hence any inferences raised by Lee's
refusal to testify did not add "'critical weight to the
prosecution's case in a form not subject to cross-
examination,'" unfairly prejudicing him and thus denying
him his right to confrontation.  (Douglas v. Alabama,
supra, 380 U.S. at p. 420, quoting Namet v. United States,
supra, 373 U.S. at p. 187.)  It simply goes too far afield
to analogize the insinuations which may have been present
in the People's questions here to questions presenting
specific facts of the offense.  (See, e.g., People v.
Shipe, supra, 49 Cal. App. 3d 343.) [footnote 4 omitted]).

FN3.  The trial court had ejected a man from the courtroom
after the man displayed a threatening demeanor when Lee
approached the witness stand.

10

Opinion at 3-10 (footnote in original).

11

A.    Opening Statement

12

Petitioner alleges that the prosecutor committed misconduct

13

during his opening statement by referring to Lee's testimony when he

14

(the prosecutor) knew that Lee might not testify.  Petitioner also

15

alleges that his confrontation rights were violated by the

16

prosecutor's conduct.

17

The Supreme Court has held that when reviewing a habeas claim

18

of prosecutorial misconduct based on a prosecutor's statements, the

19

relevant inquiry is not whether "the prosecutors' remarks were

20

undesirable or even universally condemned."  Darden v. Wainwright,

21

477 U.S. 168, 181 (1986) (citations omitted).  Rather, the issue "is

22

whether the prosecutors' comments 'so infected the trial with

23

unfairness as to make the resulting conviction a denial of due

24

process.'"  Id. (citing Donnelly v. DeChristoforo, 416 U.S. 637

25

(1974)).  "Moreover, the appropriate standard of review for such a

26

claim on writ of habeas corpus is the narrow one of due process, and

27

not the broad exercise of supervisory power."  Id. (citations

28

omitted).

In <u>Frazier v. Cupp</u>, 394 U.S. 731, 733 (1969), the Supreme Court specifically addressed a situation where the prosecutor in opening statement referred to anticipated testimony from an accomplice who had plead guilty, but who later refused to testify based on his Fifth Amendment privilege against self-incrimination.  <u>Id.</u> at 734. The Court held that, because the trial court instructed the jury not to consider any statement by counsel as evidence, that no reversible error had occurred.  <u>Id.</u> at 735-736 (finding that "not every variance between the advance description and the actual presentation constitutes reversible error, when a proper limiting instruction has been given.")  As a result, there was no prosecutorial misconduct.

The Court also addressed the issue in conjunction with the accused's right to confrontation under the Sixth and Fourteenth Amendments, and found that the limiting instructions given by the trial court were "sufficient to protect the petitioner's constitutional rights."  <u>Id.</u> at 735.  The Court noted that the opening statement was "no more than an objective summary of evidence which the prosecutor reasonably expected to produce" and that it was reasonable to assume that, given proper instructions, "the jury will ordinarily be able to limit its consideration to the evidence introduced during the trial."  <u>Id.</u> at 736.

Here, as in <u>Frazier</u>, there were sufficient admonitions to the jury that opening statements did not constitute evidence.  Both prior to and after the prosecutor's opening statement, the trial court instructed the jury that statements were not evidence.  Ex. 2

13

at 1013.   The prosecutor also stated during opening statement,
"Don't take anything I'm saying as evidence."   In addition, given
that Lee had been granted immunity and that the trial court had
determined that he had no privilege to claim, it was reasonable for
the prosecutor to assume that Lee would testify once he took the
stand.   Finally, after Lee left the witness stand, the trial court
again instructed the jury that opening statements were not evidence.
Ex. 2 at 1310.

Given the applicable case law, Petitioner cannot demonstrate
that anything in the state court's reasoned opinion denying this
claim is contrary to, or an unreasonable application of, clearly
established United States Supreme Court law.   Nor can he show that
the opinion was based on an unreasonable determination of the facts.
In addition, even if Petitioner had demonstrated a colorable claim
of error, he would not be able to show that any error had a
substantial or injurious effect on the verdict.   <u>Brecht</u>, 507 U.S. at
638.   Substantial evidence was properly admitted to support the
jury's conclusion that Petitioner was guilty.   At least one witness
(Rockwell) identified Petitioner as the shooter shortly after the
murder, including identifying him from a photo lineup.   Ex. 2 at
1058-1060, 1102.   Rockwell, who was a customer at Kragen's at the
time of shooting, heard the shooting, saw Petitioner with a gun, and
pursued him.   Numerous witnesses at trial testified that Lee's
passenger had been the shooter, and significant evidence was offered
to show that Petitioner was the passenger in question.   Ex. 2 at
1025-1030, 1070-1071, 1352-1358, 1504-1505.   For example,

Petitioner's fingerprints were on the passenger-side seatbelt, dash and door handle.  Opinion at 2.  Petitioner's cell phone was also found in the passenger seat of the car.  Id.  The car had been rented by Lee's mother, Opinion at 2, and there was no evidence that Petitioner had been a passenger in the car on some earlier occasion.  In addition, Lee's mother, after arriving at the scene of the shooting, stated that "Cameron" had been with Lee in the car.  Id.  Finally, numerous witnesses testified that the passenger in Lee's car was the shooter, and gave a description of the passenger consistent with a description of Petitioner.  Ex. 2 at 1022-1036.

Furthermore, Petitioner's alibi defense was extremely weak.  On the day of the shooting, Petitioner was named as a suspect; he went missing immediately and was a fugitive for ten months.  Ex. 2 at 1327-1333.  Three of his alibi witnesses were his family members – his mother, his aunt, and his grandmother.  Opinion at 3.  Petitioner's mother and aunt both had multiple felony convictions, making them easily impeachable.  Petitioner's other alibi witness was a friend with a felony conviction, who stated he had borrowed Petitioner's phone and given it to Lee.  Id.  Petitioner's alleged alibi was not even made known until more than a year after the murder, when Jackson (Petitioner's aunt), despite having known within a month of the murder that Petitioner was a suspect, told a defense investigator that defendant had been with her at the time of the killing.  Opinion at 17.  In addition, the prosecution also presented witnesses to rebut Petitioner's alibi defense.  Ex. 2 at 1882-1916.

15

Given the evidence of Petitioner's guilt and the weakness of his defense, the prosecutor's opening statement was not prejudicial, and this claim must be denied.

B.   Prosecutor's Questioning of Lee

Petitioner also alleges that the prosecutor's questioning of Lee constitutes reversible error.  Despite his grant of immunity, Lee refused to answer any questions posed to him by the prosecutor.

As the state court detailed, once Lee was granted immunity by the court, "his testimony was compelled and he no longer had a privilege against self-incrimination."  Opinion at 7-8; see also United States v. Washington, 431 U.S. 181, 187 (1977); Kastigar v. United States, 406 U.S. 441, 453 (1972).  Given that Lee had no colorable claim of privilege, it was not unreasonable for the court to allow the prosecutor to question Lee briefly, and Petitioner cannot demonstrate that the state court's reasoned opinion so concluding was in error under the applicable federal law.

Petitioner also maintains that his confrontation rights were violated by the prosecutor's questioning of Lee.  In Douglas v. Alabama, 380 U.S. 415, 419 (1965), the Supreme Court held that questioning of a witness who refused to testify could give rise to a Confrontation Clause violation because the questions posed to the witness "created a situation in which the jury might improperly infer both that the [inculpatory] statement had been made and that it was true," while the witness's refusal to testify prevented cross-examination.

The state court reasoned that Petitioner's case was

16

distinguishable from Douglas because "the questions asked of Lee did not suggest that he had previously given any statements, and no prior statements of Lee were admitted which could not be cross-examined. Additionally, the trial court instructed the jury to regard the People's questioning as having no evidentiary value." Opinion at 9-10.

While it is true that no prior statements of Lee's were admitted, and that the questions asked by the prosecutor did not refer to Lee's prior statements, it is also true that the prosecutor's opening statement (discussed above) did refer to Lee's prior statements. As such, this Court finds the question of whether there was a Confrontation Clause violation to be much closer than did the state court.

In Douglas, the prosecutor extensively questioned a witness who refused to testify on self-incrimination grounds. 380 U.S. at 416. The witness had already been found guilty of the crime for which Douglas was also being tried. Id. The prosecutor referred extensively to a document that detailed the circumstances of the crime, and that was purported to be a confession signed by the witness. Id. In fact, the prosecutor read the entire document, which named Douglas as the shooter during the charged crimes, during his questioning of the witness. Id. at 416-17. The Supreme Court found that, under such circumstances, "petitioner's inability to cross-examine [the witness] as to the alleged confession plainly denied him the right of cross-examination secured by the Confrontation Clause" and moreover, that the document referred to

17

extensively by the questioning prosecutor "formed a crucial link in the proof both of petitioner's act and of the requisite intent to murder," requiring reversal.  Id. at 419, 423.

This Court recognizes that under AEDPA, it is required to be highly deferential to the state court's reasoned opinion on the merits.  Indeed, as the Supreme Court has stated, federal habeas relief may not be granted even if this Court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Williams v. Taylor, 529 U.S. 362, 411 (2000).

Given the strong deference required, this Court finds that the state court's decision finding no Confrontation Clause violation was not unreasonable.  While this Court finds Petitioner's case to be more closely analogous to Douglas than did the California Supreme Court, this Court does agree that this case is distinguishable.  In contrast to Douglas, the prosecutor's questioning here did not directly refer to Lee's statements.  And while the prosecutor did refer to Lee's statements during his opening statement, he did not refer to any statements by Lee that directly inculpated Petitioner; in fact, the prosecutor stated that Lee had said Cameron Brown was not with him at Kragen's.  Opinion at 4.  See also Namet v. United States, 373 U.S. 179, 187 (1963) (finding no constitutional error when a witness's refusal to answer does not add "critical weight to the prosecution's case in a form not subject to cross-examination.")  Additionally, the trial court in this case cautioned the jury more

18

than once, instructing them both that opening statements were not evidence and that questions were not evidence.

Finally, any alleged error did not have a substantial or injurious effect on the verdict. Brecht, 507 U.S. at 638. As detailed above, ample evidence established Petitioner's guilt, his defense was weak, and the trial judge gave curative instructions. Thus, the prosecutor's questioning of Lee was not prejudicial, and this claim must be denied.

II.  Reference To Lee's Gun Possession And Evidence Of Money In Lee's Car

In this claim, Petitioner argues that his due process rights were violated when the prosecutor stated that Lee had a gun, and when the trial court admitted evidence that $825 was found in Lee's car. These issues were addressed by the state court in a reasoned opinion on direct appeal.

To begin with, the court addressed Petitioner's claim that the prosecutor committed misconduct by referring in opening statement to Lee's possession of a gun, even though he knew Lee might not testify. Opinion at 11. The court concluded that there was no misconduct for the same reasons there was no misconduct based on the prosecutor's reference to Lee's potential testimony discussed above.

Petitioner cannot demonstrate that the state court's decision was unreasonable under AEDPA. A successful claim of prosecutorial misconduct requires a showing that that "the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process." Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995) (citation omitted). Petitioner cannot show

19

that the prosecutor's reference to Lee's gun rendered his trial fundamentally unfair or unduly prejudiced him, particularly considering that no evidence of Lee's gun possession was admitted and that the trial judge instructed the jury that the prosecutor's opening statement was not evidence.  <u>Brecht</u>, 507 U.S. at 638.  Thus, this portion of Petitioner's claim must be denied.

Petitioner also maintains that the trial court's admission of evidence that Lee possessed $825 in his car violated Petitioner's due process rights.  According to Petitioner, the evidence was irrelevant.  In addition, Petitioner maintains that the evidence, in connection with evidence that there was a cell phone and drugs in the car, tended to suggest that Lee was a drug dealer and that Petitioner was guilty by association.

The appellate court found that, under the applicable law, the trial court had not abused its discretion in admitting the evidence. Opinion at 12-13.  Recognizing that evidence must be relevant to be admissible, (Cal. Evid. Code §§ 210, 350), the court found that evidence of the cash was relevant, among other reasons, because it was found in the car from which the murderer emerged at the crime scene.  Opinion at 13.  To the extent the money and other evidence suggested the murder had a "drug-deal motive", the court found that such an inference came "from the murderer's association with evidence found at the scene rather than the murderer's association with Lee." Opinion at 13 (citations omitted).  The state court also found that Petitioner's allegations of undue prejudice were without merit.  Any bias that might have arisen as a result of the evidence

20

of the money "was negligible given that motive was unimportant in this case and Lee's credibility does not reflect on defendant. Moreover, the People never mentioned the $825 during argument and admitted to the jury that they proved no motive, which only underscores that the cash-in-the-car turned out to be an insignificant passing point in an eight-day trial." Opinion at 14-15.

Here, Petitioner has not demonstrated that the state court's reasoned opinion is contrary to, or an unreasonable application of, clearly established United States Supreme Court law. Petitioner also fails to demonstrate that the state court's opinion relied on an unreasonable determination of the facts.

The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. See Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995). Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process. See Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991).

Here, as the state court reasonably decided, there was no error in admission of the evidence of cash in the car because it was arguably relevant to motive. It was not admitted to demonstrate Petitioner's generally violent character or his guilt for the alleged crimes. Contrary to Petitioner's assertion, it was not unduly prejudicial, but rather, as the trial court concluded, "insignificant." Opinion at 15. As such, admission of the

1  testimony did not violate due process.

2      Furthermore, in order to obtain habeas relief on the basis of

3  an evidentiary error, a petitioner must show that the error was one

4  of constitutional dimension and that it was not harmless under

5  Brecht.  Here, for the reasons discussed in detail above, Petitioner

6  cannot show that the trial court's alleged error had "'a substantial

7  and injurious effect' on the verdict." Dillard v Roe, 244 F.3d 758,

8  767 n.7 (9th Cir. 2001) (quoting Brecht, 507 U.S. at 623).  Because

9  Petitioner cannot demonstrate prejudice, his claim must be denied.

10 III. Expert Witness

11     In this claim, Petitioner maintains that the trial court's

12 limitation of his expert witness' testimony violated his due process

13 right to present a defense.  The state court dismissed this claim in

14 a reasoned opinion on direct appeal.

15         During trial, defendant proffered the testimony of
       Dr. Robert Shomer, an expert on eyewitness identification
16     for the purposes of (1) showing the weaknesses of
       photographic lineups and (2) discussing "all the various
17     areas about eyewitness identification."  Following
       discussions, the trial court ruled that Dr. Shomer could
18     testify about photographic lineups but not about
       eyewitness identification in general.
19
           Defendant contends that the trial court erred when it
20     limited the testimony of Dr. Shomer.  He adds that the
       error deprived him if his constitutional right to present
21     a defense and was prejudicial.  We disagree.

22         In People v. McDonald (1984) 37 Cal. 3d 351, 377, the
       court held that the trial court abused its discretion by
23     excluding testimony from a defense expert witness on
       eyewitness identification.  There, the eyewitness
24     testimony was the only evidence that connected the
       defendant to the crime.  (Id. at p. 360.)  The McDonald
25     court stated: "[T]he decision to admit or exclude expert
       testimony on psychological factors affecting eyewitness
26     identification remains primarily a matter within the trial
       court's discretion. . . . [Citation.]  We expect that such
27

28                                22

evidence will not often be needed, and in the usual case
the appellate court will continue to defer to the trial
court's discretion in this matter.  Yet deference is not
abdication.  When an eyewitness identification of the
defendant is a key element of the prosecution's case but
is not substantially corroborated by evidence giving it
independent reliability, and the defendant offers
qualified expert testimony on specific psychological
factors shown by the record that could have affected the
accuracy of the identification but are not likely to be
fully known to or understood by the jury, it will
ordinarily be error to exclude that testimony."  (Id. at
p. 377, fn. omitted.)

    In People v. Sanders (1995) 11 Cal. 4th 475, 509
(Sanders), the court reaffirmed McDonald but distinguished
it on the ground that the eyewitness testimony in Sanders
was corroborated by other evidence.

    In People v. Jones (2003) 30 Cal. 4th 1084, 1112
(Jones), . . . as in Sanders, the Supreme Court found that
the trial court had properly excluded testimony by a
defense expert on eyewitness identification because of the
substantial corroborating evidence other than the
eyewitness testimony.

    Here, as in Jones and Sanders, there was "other
evidence that substantially corroborates the eyewitness
identification and gives it independent reliability."
(Jones, supra, 30 Cal. 4th at p. 1112.)

    Defendant and Lee were friends.  Lee drove the
Cadillac immediately before switching to the Monte Carlo.
Defendant's fingerprints in the Cadillac suggest that
defendant was in the Cadillac with Lee before the switch.
Roman told the police that defendant had been with Lee.
The murderer came from the passenger seat of Lee's car.
Defendant's cell phone was found in the passenger seat of
Lee's car.  The murderer ran from the scene.  Rockwell
intercepted defendant who had been running away from the
scene.  That defendant had explanations for this evidence
does not negate that the evidence corroborates Rockwell's
identification.

    Because other testimony linked defendant to the
murder, the eyewitness testimony had independent
reliability.  Thus, the trial court did not abuse its
discretion when it limited Dr. Shomer's testimony.
(Sanders, supra, 11 Cal. 4th at p. 509.)

    We add that, in McDonald, the reliability of the
eyewitness identification was undermined by a very strong

23

alibi defense.  By comparison, defendant's alibi defense
is simply not credible.  Defendant's witnesses were all
his relatives and friends.  All but one were felons.  But,
most importantly, the alibi did not surface until July 5,
2005, one year and nearly four months after the murder,
when Jackson told a defense investigator that defendant
had been with her at the time of the murder.  Jackson made
this belated revelation despite the fact that Jackson had
been aware that defendant's "picture was put on the news"
while the police were looking for defendant.  Jackson made
this belated revelation despite the fact that Jackson knew
within a month of the murder that defendant was wanted for
murder in Seaside.  In addition, on the day of the murder,
Jackson telephoned Seaside Police Detective Judy Straden
to ask why Sacramento police had been at her home looking
for defendant and learned from Detective Straden that the
Seaside police wished to question defendant about a
shooting.  Yet Jackson failed to take these opportunities
to tell Sacramento police or Detective Straden that
defendant was with her in Sacramento at the time of the
shooting.  Moreover, defendant presumably knew that he was
a murder suspect shortly after the murder given that he
lived with Jackson.  Yet he failed to surrender when one
would expect just that from a murder suspect with a
legitimate alibi.

We reject defendant's contention that the limitation
on Dr. Shomer's testimony deprived him of his state and
federal constitutional rights to present a defense.  The
application of the ordinary rules of evidence to exclude
defense evidence does not infringe on the right to present
a defense.  (People v. Fudge (1994) 7 Cal. 4th 1075, 1102-
1103.)  The Sixth and Fourteenth Amendments guarantee a
state criminal defendant a meaningful opportunity to
present a complete defense.  (Crane v. Kentucky (1986) 476
U.S. 683, 690-691.)  However, the right to present
relevant testimony is not without limitation, and may, in
appropriate cases, "bow to accommodate other legitimate
interests in the criminal trial process."  (Michigan v.
Lucas (1991) 500 U.S. 145, 149.)  Erroneous evidentiary
rulings can in a particular case in combination rise to a
level of a due process violation.  (Montana v. Egelhoff
(1996) 518 U.S. 37, 53 [citations omitted].)  But a defendant is not
denied his right to present a defense "whenever 'critical evidence'
favorable to him is excluded."  (Ibid.)  Accordingly, the application
of the rules of evidence does not violate a defendant's right to
present a defense, and although the "complete exclusion" of evidence
establishing a defense could theoretically rise to the level of a
constitutional violation, the exclusion of defense evidence on a
minor point does not.  (People v. Cunningham (2001) 25 Cal. 4th 926,
998-999.)

24

1
2
3
4
5
6

    Here, defendant had ample opportunity to challenge
his identification via his alibi witnesses, by cross-
examination, and by trial counsel's comments during
final argument.  And the trial court instructed the
jury in the language of CALJIC No. 2.92, which
generally covers the same ground as expert-given
eyewitness-identification testimony.  (See <u>People v.
Wright</u> (1988) 45 Cal. 3d 1126, 1144.)  Dr. Shomer's
testimony was therefore not critical to the defense and
exclusion of it did not deny defendant his rights to
due process or to present a defense.

7   Opinion at 15-18.

8   Petitioner cannot demonstrate that anything in the state

9   court's reasoned opinion denying this claim is contrary to, or an

10   unreasonable application of, clearly established United States

11   Supreme Court law.  Nor can he show that the opinion was based on an

12   unreasonable determination of the facts.

13   "While the Constitution [] prohibits the exclusion of defense

14   evidence under rules that serve no legitimate purpose or that are

15   disproportionate to the ends that they are asserted to promote,

16   well-established rules of evidence permit trial judges to exclude

17   evidence if its probative value is outweighed by certain other

18   factors such as unfair prejudice, confusion of the issues, or

19   potential to mislead the jury."  <u>Holmes v. South Carolina</u>, 547 U.S.

20   319, 326 (2006).  Evidence that is marginally relevant, repetitive,

21   speculative or confusing may be properly excluded.  <u>Id.</u> at 326-327;

22   <u>see also</u> <u>United State v. Scheffer</u>, 523 U.S. 303, 308 (1998) (holding

23   that a "defendant's right to present relevant evidence is not

24   unlimited, but rather is subject to reasonable restrictions" such as

25   evidentiary and procedural rules.)

26   Here, the state court found that any exclusion was not in error

27

28                                    25

and did not violate Petitioner's right to present a defense, and
Petitioner cannot show that those findings were unreasonable.  As
the state court found, Petitioner was linked to the murder through
more than simply eyewitness evidence, and his alibi defense was "not
credible."  Opinion at 16-17.  In addition, Petitioner had ample
opportunity to challenge his eyewitness identifications, and the
jury was read an instruction that covered "the same ground as
expert-given eyewitness-identification testimony," rendering any
potential additional expert testimony cumulative.  Opinion at 18.
Finally, for the reasons discussed, Petitioner also cannot show that
any alleged error had "'a substantial and injurious effect' on the
verdict.'"  Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th Cir. 2001)
(quoting Brecht, 507 U.S. at 623).  Because Petitioner cannot
demonstrate prejudice, his claim must be denied.

IV.  Confidential Informants

    In this claim, Petitioner contends that his due process rights
were violated when the trial court refused to disclose the
identities of two non-testifying confidential informants.  The state
court addressed this issue in a reasoned opinion on direct appeal.

    Witness A told Seaside Police Officer Tracy Spencer that she
had been near the scene of the murder, and that when she walked to
the scene, she heard from another person (witness B) that Petitioner
was the shooter.  Opinion at 18.  Petitioner's trial counsel moved
to discover the identities of witnesses A and B; the prosecutor
objected on, among other things, the ground of informant privilege
under Cal. Evid. Code § 1041.  Id.  The trial court denied

Petitioner's motion, finding that "neither [witness] appear[s] to have the type of information statutorily discoverable, and both have expressed their wish to remain anonymous in the nature of the case and leads the Court to believe that their fears for their safety would be justified and that no reason exists at this juncture to compel discovery in either."  Opinion at 19.

The appellate court, after reviewing <u>de novo</u> the trial court's denial of the motion, first held "an informant is not a material witness when he or she simply points the finger of suspicion toward a person who has violated the law.  (<u>People v. Wilks</u> (1978) 21 Cal. 3d 460, 469.)"  Opinion at 21.  The court went on to find as follows.

> As to witness A, defendant urges that "the identity of witness A must be disclosed because withholding her identity deprived [him] of a fair trial under the statutes and under the state and federal constitutions."  But defendant offers no reasoned explanation to support this claim.  He concedes, . . . that witness A was not an eyewitness [] to the crime.  And we observe that witness A could not offer any testimony, favorable or unfavorable, given that the extent of witness A's knowledge (excluding the identity of witness B) is based upon objectionable hearsay.  Defendant's point that this hearsay conclusion is proved only by Officer Spencer's opinion of witness A's materiality is simply not true.  The hearsay conclusion is proved by what witness A said to Officer Spencer.  The most that can be said is that witness A can testify to the identity of witness B who was inferentially an eyewitness.  However, Officer Spencer can identify witness B without the necessity of invading the informant's privilege as to witness A.

> It is true that, although a defendant has the burden of producing some evidence on the issue, he or she need not prove that the informant was a participant in, nor an eyewitness to, the crime.  (<u>People v. Garcia</u> (1967) 67 Cal. 2d 830, 837.)  Here, however, there was no reasonable possibility that defendant could reasonably expect to glean from witness A any evidence that tended to exonerate him of the crime for which he was convicted.  That witness

A heard that defendant had curly hair is inadmissible
hearsay and hardly exonerating if defendant's hair was not
curly.  Therefore, the trial court correctly denied
defendant's motion as to witness A.  (<u>People v. Luera</u>,
<u>supra</u>, 86 Cal. App. 4th at pp. 525-526.)

   As to witness B, defendant urges that disclosure was
required because witness B "did not qualify as a
confidential informant under Evidence Code section 1041."
According to defendant, witness B does not qualify as an
informant because he or she did not furnish information to
a law enforcement officer in confidence.  (Evid. Code,
§ 1041, subd. (b).)  Defendant acknowledges that witness
B's statement to witness A incriminates rather than
exonerates him.  But he claims that witness B was an
eyewitness to the murder.  He then speculates that witness
B might have motives to protect the real murderer and,
thus, falsely implicate him.

   We decline to analyze whether there is a pass-through
confidential-informant privilege, as the People assert,
because the "official information" privilege applies to
witness B.  Evidence Code section 1040 provides that a
public entity has a privilege to refuse to disclose
official information, and to prevent another from
disclosing official information if disclosure of the
information is against the public interest because there
is a necessity for preserving the confidentiality of the
information that outweighs the necessity for disclosure.

   . . . .

   A person's identity can be revealed to a public
entity in confidence by a third person as witness A
revealed witness B's identity here.  Though we question
whether defendant's speculation about witness B's motives
was sufficient to trigger an in camera hearing for
purposes of overcoming the People's privilege claim
(equates to a reasonable possibility that witness B could
give evidence on the issue of guilt that might exonerate
the defendant), the fact is that the trial court held an
in camera hearing and thereafter found against defendant's
position. [footnote omitted].

   Defendant asks that, in the event we find no error in
the record we review the sealed transcript of the in
camera hearing to determine whether the trial court
correctly upheld the privilege. [footnote omitted].  We
have done so.  Based on that review, we conclude that "the
record demonstrates, based on a sufficiently searching
inquiry, that [witness B] could not have provided any
evidence that, to a reasonable possibility, might have

1
2
3
4
5
6
7

exonerated defendant." . . . In particular, our reading of
the transcript leads us to dismiss defendant's speculation
about witness B's motives as unfounded.  Moreover, we
observe that defendant's theory could turn any
incriminating confidential informant into a disclosed
informant by the simple devise of claiming that the
informant might be lying to protect someone else.  The
theory borders on being unreasonable speculation that does
not reach at least the low plateau of reasonable
possibility.  Again, an informant is not a material
witness when he or she simply points the finger of
suspicion toward a person who has violated the law.
(People v. Wilks, supra, 21 Cal. 3d at p. 469.)

8  Opinion at 21-24.

9      Petitioner cannot demonstrate that anything in the state

10  court's reasoned opinion denying this claim is contrary to, or an

11  unreasonable application of, clearly established United States

12  Supreme Court law.  Nor can he show that the opinion was based on an

13  unreasonable determination of the facts.

14      While the Supreme Court has not squarely addressed the

15  constitutional issues regarding a state's privilege to withhold the

16  identity of confidential informants, it has addressed the issue with

17  regard to the supervisory power of the federal courts in federal

18  criminal trials.  In Roviaro v. United States, 353 U.S. 53 (1957),

19  the Court held that the government's privilege to withhold the

20  identity of a confidential informant is not absolute, but must give

21  way "[w]here the disclosure of an informer's identity, or of the

22  contents of his communication, is relevant and helpful to the

23  defense of an accused, or is essential to a fair determination of a

24  cause."  Id. at 60-61.  The Ninth Circuit has confirmed that when

25  disclosure would not lead to testimony or other evidence that would

26  be of material benefit to the defense, disclosure is not required.

27
28

29

United States v. Gonzalo-Beltran, 915 F.2d 487, 489-490 (9th Cir. 1990).

Here, Petitioner cannot demonstrate that disclosure of witness A's and B's identities would have been of "material benefit" to his defense.  Witness A, as the state court noted, was not an eyewitness to the crime and could have provided no information exculpatory to Petitioner.  As such, Petitioner cannot show that disclosure of her identity would have led to evidence that would have been of material benefit to his defense.  See Gonzalo-Beltran, 915 F.2d at 489-490. And while witness B was purportedly an eyewitness to the crime, the state court's conclusion that witness B would not have aided Petitioner's defense was not unreasonable.  There were multiple eyewitnesses, witness B's information inculpated Petitioner, and Petitioner's argument that disclosure of witness B's identity might have enabled him to uncover a motive for witness B to lie is merely speculative.  Furthermore, the trial court found that the confidential informants' fears for their safety if their identities did not remain anonymous were justified.  Opinion at 19.  See also Gonzalo-Beltran, 915 F.2d at 489.  In sum, because Petitioner cannot demonstrate that disclosure of witness A and witness B's identities would have been material and favorable to his defense, nor can he demonstrate that any alleged error by the trial was prejudicial, his claim must fail.

V.   Ineffective Assistance of Counsel

Petitioner claims his trial counsel was ineffective for failing to object to the trial court's jury instruction regarding Lee's

refusal to testify and for not immediately objecting to alleged juror misconduct.

The Sixth Amendment guarantees the right to effective assistance of counsel. <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984). To prevail on a claim of ineffective assistance of counsel, Petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced Petitioner's defense. <u>Id.</u> at 688. To prove deficient performance, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. <u>Id.</u> To prove counsel's performance was prejudicial, Petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> at 694.

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies. <u>See</u> <u>Strickland</u>, 466 U.S. at 697; <u>Williams v. Calderon</u>, 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995) (approving district court's refusal to consider whether counsel's conduct was deficient after determining that petitioner could not establish prejudice), <u>cert. denied</u>, 516 U.S. 1124 (1996).

A.   Jury Instructions

Petitioner alleges that his counsel provided ineffective assistance when she failed to object to the jury instruction regarding Lee's refusal to testify. The trial court instructed the

jury in pertinent part as follows after Lee left the stand:

> [I]n a situation like this, I must remind you of some earlier instructions that I had given to you: A question is not evidence.  It may be considered only as it helps you to understand any answer given to the question. Statements made by the attorneys during trial are not evidence.  You are not to assume to be true any insinuations suggested by a question asked a witness.  It is up to you to draw your own conclusions as to any reasons a witness might have for refusing to testify, but you should not regard the questioning of this witness as having any evidentiary value.

Ex. 2 at 1310.

Petitioner cannot, however, demonstrate that his counsel's decision not to object to this jury instruction was constitutionally deficient.  As this Court has already concluded, the state court was not unreasonable in finding that Lee's refusal to testify was not prejudicial to Petitioner.  In addition, the state appellate court concluded that the trial court was not in error when it instructed the jury regarding Lee's refusal to testify (Opinion at 8), a conclusion that Petitioner cannot demonstrate is unreasonable.

Given that there was no instructional error, any objection to the instruction by Petitioner's trial counsel would likely have been overruled.  <u>Strickland</u> and its progeny do not require that trial counsel make futile objections and, thus, the decision of Petitioner's counsel was reasonable under these circumstances.  <u>See Sanders v. Ratelle</u>, 21 F.3d 1446, 1456 (9th Cir. 1994). Furthermore, Petitioner cannot demonstrate that he suffered any prejudice due to his counsel's failure to object to the jury instruction.  Given that any objection would have been futile, there is no reasonable probability that, had the objection been made, the

result of the proceeding would have been different.   <u>Strickland</u>, 466

U.S. at 693-694.   Accordingly, Petitioner's claim must be denied.

B.    Juror Misconduct

Petitioner also alleges that his trial counsel was ineffective

when she did not immediately object to alleged juror misconduct.

This issue relates to information presented in Petitioner's motion

for a new trial.

Petitioner's mother, Melissa De La Cruz, testified during the

hearing on a motion for a new trial that she had seen Leroy Davis,

step-grandfather of the murder victim, speak to a juror from

Petitioner's trial during the trial itself.   She testified that she

had overheard Davis, who was serving as a juror in another case, say

to Petitioner's juror that "you have to be careful about family

members getting to the stand because they will lie" and "you have to

look them in the eye."   Ex. 2 at 2508-2515.   De La Cruz also stated

that she had notified the defense investigator and Petitioner's

counsel about what she had overheard.   Ex. 2 at 2510.   Petitioner's

counsel did not notify the trial court of De La Cruz's observations

or move for a mistrial at that time, but rather raised the issue

post-trial.   On direct appeal, the state court agreed with the trial

court that Petitioner had forfeited the issue "because defendant's

counsel had been aware of the claimed misconduct during trial but

failed to bring it forward to the Court."   Opinion at 27 (internal

quotations omitted).

The appellate court noted, however, that the trial court had

essentially determined that any alleged misconduct was not

33

prejudicial, a conclusion with which the appellate court agreed.

Opinion at 26-27.  The trial court stated on the record:

> Well, what the evidence is, is that some other juror
> told a juror on this trial during the course of the trial,
> while on a break, that that juror should scrutinize the
> testimony of the family members. . . .  This Court
> exhaustibly [sic], I think, instructed our jurors as to
> how to go about their job as jurors, how to keep open
> minds in the case, how to – there was a specific jury
> instruction as to how to approach and evaluate the
> testimony of each witness.  What was said, assuming it was
> said, was nothing more than the obvious, that with respect
> to family members testifying, you need to be careful, you
> need to scrutinize them, the man said you need to look
> them in the eye.  He doesn't say that they're always
> lying, you have to be careful.  The test is whether or not
> information that was conveyed to the juror would likely
> have led to a different result in the case.  And I simply
> don't find that is the case.  This is a – a consideration
> that any rational juror would go through in his own mind,
> that you need to be careful about the testimony of someone
> who's closely involved, closely related, who has the
> obvious bias in the case.  If you want to put it that way,
> a strong reference, that the family member, the son in the
> case of a testifying witness might be prone to help the
> defendant out.  That's obvious.  And that was an obvious
> issue in argument; it was an issue all the way through the
> case, the question of bias, and I do not find that, based
> on this information, that the juror received any
> information, he received absolutely nothing that was
> factual about the case, just a general statement that any
> responsible juror would have considered in his own mind,
> and that the – that the Court's instructions covered.  So
> I see no – no reason to conduct an inquiry, no reason to
> bring the juror in, no reason to, . . . that there was any
> interference with the deliberative process of the jury or
> that there was any impropriety.

Opinion at 26-27 (quoting Ex. 2 at 2251-2252).

Here, Petitioner cannot demonstrate that the state courts'

findings were unreasonable or that his counsel's actions were in

anyway prejudicial to him.[1]

---

[1] A court need not determine whether counsel's performance was
deficient before examining the prejudice suffered by the defendant as
the result of the alleged deficiencies.  See Strickland, 466 U.S. at

To begin with, clearly established federal law, as determined by the Supreme Court, does not require state or federal courts to hold a hearing every time a claim of juror bias is raised by the parties.  <u>Tracey v. Palmateer</u>, 341 F.3d 1037, 1045 (9th Cir. 2003).  Thus, Petitioner cannot demonstrate that he would have been entitled to a full hearing on this issue had his counsel raised it earlier in the proceedings.

Furthermore, a petitioner is entitled to habeas relief on the basis of juror misconduct only if it can be established that exposure to extrinsic evidence had a "'substantial and injurious effect or influence in determining the jury's verdict.'"  <u>Sassounian v. Roe</u>, 230 F.3d 1097, 1108 (9th Cir. 2000) (quoting <u>Brecht</u>, 507 U.S. at 623); <u>see</u> <u>Jeffries v. Blodgett</u>, 5 F.3d 1180, 1190 (9th Cir. 1993) (same).  In other words, the error must result in "actual prejudice."  <u>Brecht</u>, 507 U.S. at 637.  The trial judge in Petitioner's case found, not unreasonably, that there was no indication that the information conveyed to the juror in Petitioner's trial was influential on the verdict.  Opinion at 26.  Jurors may rationally decide to scrutinize carefully the testimony of close relatives of a defendant, and are likely to do so even absent any extrinsic comments.  <u>See</u>, <u>e.g.</u>, <u>Allen v. Woodford</u>, 366 F.3d 823, 846 (9th Cir. 2004).  Given that any alleged juror misconduct was not prejudicial to Petitioner, he cannot now show that his counsel's decision not to object to that alleged misconduct during the trial itself was prejudicial.  <u>Strickland</u>, 466 U.S. at

697.

693-694.

VI.   Cumulative Error

     Petitioner claims that the cumulative effect of the alleged errors at his trial requires reversal.   The state court denied this claim in a reasoned opinion on direct appeal.   Opinion at 28.

     In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned.   See Alcala v. Woodford, 334 F.3d 862, 893-895 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution); Thomas v. Hubbard, 273 F.3d 1164, 1179-1181 (9th Cir. 2002) (reversing conviction based on cumulative prejudicial effect of numerous errors). Where there is no single constitutional error, however, nothing can accumulate to the level of a constitutional violation.   See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002); Fuller v. Roe, 182 F.3d 699, 704 (9th Cir. 1999).

     Here, the state court reasonably found that Petitioner did not demonstrate any trial court error.   Thus, Petitioner's claim of cumulative error must fail and he is not entitled to a federal habeas corpus relief on this claim.

                              CONCLUSION

     For the foregoing reasons, the Petition for a Writ of Habeas Corpus is DENIED.   Further, a Certificate of Appealability is DENIED as to the majority of Petitioner's claims.   See Rule 11(a) of the

Rules Governing Section 2254 Cases (effective Dec. 1, 2009).
Petitioner may not appeal the denial of a Certificate of
Appealability in this Court but may seek a certificate from the
Ninth Circuit under Rule 22 of the Federal Rules of Appellate
Procedure.  Id.

     A Certificate of Appealability is GRANTED solely as to
Petitioner's claims that the state court erred in its finding that
there was: 1) no prejudicial error as a result of the prosecutor's
opening statement referring to the testimony of Lee and; 2) no
prejudicial error as the result of the prosecutor's questioning of
Lee when Lee had indicated he would refuse to testify.  As to these
claims, petitioner has demonstrated that "jurists of reason would
find it debatable whether the petition states a valid claim of the
denial of a constitutional right."  Slack v McDaniel, 529 U.S. 473,
484 (2000).

     The Clerk of Court shall terminate all pending motions as
moot, enter Judgment in accordance with this Order and close the
file.

     IT IS SO ORDERED.


Dated: 2/7/2011

                              CLAUDIA WILKEN
                              United States District Judge

37

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

CAMERON BROWN,

      Plaintiff,

  v.

LARRY SMALL et al,

      Defendant.
_____/

Case Number: CV08-05529 CW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on February 7, 2011, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Cameron  Brown F-13991
CSP-Calipatria
P.O. Box 5002
Calipatria,  CA 92233-5002

Dated: February 7, 2011

                        Richard W. Wieking, Clerk
                        By: Nikki Riley, Deputy Clerk

38